NOTICE

Decision filed 07/06/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250039-U

NO. 5-25-0039

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PATRICIA EADS, as Trustee of the William H. Dorman Trust, | ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 22-CH-52 |
| AMANDA ABERNATHY, | ) ) ) | Honorable Ronald S. Motil, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1  *Held*: We affirm the trial court's judgment where (1) this court does have jurisdiction to review the claims of error; (2) the trial court's findings were not against the manifest weight of the evidence; and (3) the trial court did not err when it imposed sanctions against plaintiff pursuant to Illinois Supreme Court Rule 137.

¶ 2  Plaintiff, Patricia Eads, filed an action to quiet title and for other relief against defendant, Amanda Abernathy. Plaintiff filed suit in her alleged capacity as Trustee of the William H. Dorman Trust (Trust). The Dorman trust owns certain real estate located in Madison County, Illinois, adjacent to defendant's property. Plaintiff alleged that a fence erected by defendant in 2021 encroached on the Trust's property. After a bench trial, the trial court entered judgment for defendant, finding that plaintiff failed to sustain her burden of proof and found that her action was

1

not brought in good faith and was frivolous in nature pursuant to Illinois Supreme Court Rule 137. Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018). The trial court ordered plaintiff to pay defendant's attorney fees as a sanction. Plaintiff now appeals the trial court's judgment in favor of defendant, as well as the order imposing sanctions. For the following reasons, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4      On November 15, 2022, plaintiff filed an action to quiet title and for other relief against defendant. Plaintiff filed suit in her alleged capacity as trustee of the Trust that owned certain real estate located in Madison County, Illinois, adjacent to defendant's property. In her complaint, plaintiff alleged that defendant "erected a lumber fence in 2021 which is exclusively on Plaintiff[']s property." Defendant filed an answer to the complaint on January 17, 2023, stating she could neither admit nor deny that plaintiff was the trustee of the Trust or that the Trust held superior title to the property at issue. Defendant requested that the action be dismissed and she be awarded her costs and attorney fees. The matter eventually proceeded to a bench trial on September 21, 2023.

¶ 5      During opening statements, defendant's counsel explained that in November 2021, a conflict began to arise between defendant and a Robert Dorman, who frequently maintained the property at issue and "had a persistent habit of cutting his lawn in such a manner that threw grass clippings, rocks and other debris" onto defendant's property line. Defendant's counsel continued, stating that due to the property issue that had arisen between defendant and Dorman in November 2021, defendant extended an existing fence between the properties. Counsel claimed that defendant had communicated with Dorman about the potential placement of the fence and that a land survey had been done by "the Dormans" to determine the pin locations and property line at issue. Counsel stated that the existing fence was extended based upon the property pins located

during that land survey but that suit had not been brought by plaintiff to adjudicate the claimed encroachment of the fence until after a mutual injunction was entered prohibiting contact between defendant and Dorman. Defendant's counsel claimed that the quiet title action was brought in retaliation and as part of the "ill-will reflected in Dorman's actions again proven in this Court just a week ago," referencing an order of protection hearing involving Dorman and defendant. Counsel asked that the trial court take judicial notice of the testimony and exhibits from the earlier order of protection hearing.

¶ 6    Plaintiff called Michael Andreas as her first witness. Andreas testified that he was an engineer "by education" and owned a consulting business called Andreas Consulting Services. He further testified that while he was not a professional land surveyor or a land surveyor licensed and certified with the state of Illinois, he had taken surveying courses while obtaining his degree at the University of Illinois and had done surveying for about the past 50 years. He stated that he owned surveying equipment in the form of a Trimble R12i, which he described as having "sub-meter accuracy," and that he had used GPS satellite survey systems for the past 10 years. He described the satellite system as using satellites to "determine the elevation within sub-meter accuracy on points and things" and stated he used such a system in this case.

¶ 7    Andreas testified that Robert Dorman was a friend, so at "no cost to [Dorman]," he performed a survey of the real property at issue in this case. He stated that Dorman showed him the property lines, that he shot the two pins, which were clearly marked by a licensed land surveyor, and then he walked along the fence line and surveyed every post. Andreas then used AutoCAD, which he stated "geo references all the survey points" and utilized it to draw a straight line between the two property pins and then placed the fence along that line based on his survey of the posts. The process generated two printout sheets, which he gave to Dorman. Andreas testified that he

3

performed the work described to the same standards and precision as he would any other job, although he indicated that the equipment used "does the precision."

¶ 8    Plaintiff moved to qualify Andreas as an expert. Defendant objected on the basis that Andreas had testified that he was not a "professional" land surveyor, meaning he was not "certified by industry standards to be a professional in that field." Defendant allowed that Andreas might be a lay witness with "significant knowledge based upon his experience" but did not believe that expertise had been established. Plaintiff countered that the standard for qualifying a witness as an expert was that the witness had "knowledge, training, education or experience beyond that of a layperson" and claimed that had been clearly established as to Andreas. The trial court sustained the objection, and declined to qualify Andreas as an expert. It did, however, allow Andreas to continue testifying about his work based on his years of experience surveying property.

¶ 9    Andreas testified that, based on his survey of just the fence line, some of the fence crossed onto the Trust's property. This was demonstrated using a physical exhibit entered into evidence over objection, which was a printout of the AutoCAD drawing he had made of the presumed property line, a straight line connecting the two pins he had located, and each post of the fence situated relative to that property line. Andreas testified that eight feet of the fence encroached upon the Trust property, and the encroachment ranged from one-tenth of a foot to a half-foot. Andreas also indicated that there were portions of the fence that were as much as a foot over the property line. Andreas estimated that about 90% of the fence was over the property line and on the Trust's side, with only about six feet of the fence being on the defendant's side.

¶ 10    During cross-examination, Andreas testified that, prior to conducting the survey for Dorman, they had been friends for somewhere between six months and a year and that friendship started in connection with his wife's campaign for Madison County Clerk, which Dorman helped

with. When asked, he affirmed that his friendship with Dorman was "so strong that [he] conducted all of this work *pro bono*, for free." Andreas testified that the survey work totaled around two hours. He also testified that he surveyed the entire fence and had not noted a new section of the fence versus an older section in his survey materials.

¶ 11    Andreas was also shown a photograph of a stake in the ground, which he indicated was a property corner and more specifically the west corner of the fence built along the line of the divide between the defendant's property and the Trust property. Andreas testified that he did not place that stake, but that it had been around the location of one of the property pins when he performed his survey, although he was not sure exactly how close to the pin it was located. Andreas testified that the stake might have been right at the pin or six inches away from it, but that it had helped him locate the pin. Andreas was then shown two more images, one of which showed a property pin embedded in the ground. That pin appeared to be the one left by surveyor Jeffrey M. Pauk, which Andreas used to establish the property line, although Andreas indicated that he could not see the surveyor's mark on the pin so he could not be sure it was the correct pin. Andreas was able to identify approximately where the pin would have been in the ground relative to the stake based on the other image. Andreas was also shown several more images of the fence which included wooden stakes which he agreed appeared to indicate the property line. Several of those photos featured a stake near a telephone pole by the roadway, which Andreas agreed was in the "general location" of the property pin, within about a foot of it, although the pin could not be seen in the photos. Andreas testified that the wooden stakes were placed after he performed his work. He indicated that he found the pins based on reference to the property plat and statements about where they were located by Dorman. Andreas testified that the pins were "flush to the ground, just maybe a little bit under the ground."

5

¶ 12    Andreas detailed how the Trimble R12i worked and how he had used it to map the position of the pins. He testified that the Trimble R12i had three components to it. The first was a head unit that connected to satellites, the second was a cell phone type device that collected the location data, and the third was a little computer with a screen that also collected data. The Trimble R12i was then placed with the tip of the device on top of the pin, which was placed by a licensed professional surveyor as only they could place property pins, and it then recorded the location of that pin using satellite data. Initially, Andreas testified that the location data of the Trimble R12i was accurate within a meter, or approximately three feet, of distance, but after a brief recess, he testified he had Googled the device's accuracy and found that its location accuracy was actually within a decimeter, or between 8 and 15 millimeters. He indicated that the Trimble R12i needed to be calibrated "probably every couple of years" but that he had owned his unit "less than two years." He indicated that he updated the device utilizing its manufacturer website, which also determined if the device had errors, but that he had not done that prior to his work for Dorman because it "wasn't necessary."

¶ 13    During cross-examination, Andreas clarified that the work he had done for Dorman was not a land survey, as he was not a land surveyor. Instead, the work he did only looked at how much encroachment there was onto the Trust's property by the defendant's fence.

¶ 14    Plaintiff next testified. She testified that she was a trustee of the Trust, which held the money, house, and vehicles of William H. Dorman, her father. The property owned by the Trust at issue in the case, was a house located at 25 Pat Drive, within the Collinsville, Illinois, township, with a lot behind it and "catty-corner" from it. Plaintiff testified that the defendant's property was situated "behind" the Trust's property, adjoining it. She testified that, prior to 2021, there was no fence but that one was erected in 2021. Plaintiff stated that the fence was not built at her request,

6

although defendant notified her brother, Robert Dorman, by text that it would be erected, and her brother told defendant to have the property surveyed and "probably contact an attorney" before the fence was built. To her knowledge, the property was not surveyed prior to the fence being built but it appeared to have been surveyed after, as her husband encountered someone who claimed to be a surveyor on the Trust's property after the fence was erected. She testified that around November 14, 2021, she hired certified surveyor Pauk to perform a survey, "but he could not be here today." Plaintiff testified that, to her knowledge, the fence at issue was on the Trust's side of the property line and that she had incurred attorney fees in bringing suit to quiet title to the Trust's property.

¶ 15    During cross-examination, plaintiff testified that she did not have a copy of the Trust documents, although she did have a copy of the will establishing the Trust. She also did not have a copy of the Trust property's deed, although she did have documentation of the property taxes for the property. Upon questioning, plaintiff also admitted that prior to 2021, "there was a back fence and a little L off of it, which is the 6 feet which is on the property line." However, when shown a picture of the fence, plaintiff claimed that the visually "newer" section of the fence was from "where my nephew ran into it with a lawn mower and they had to replace it." Upon further inquiry, though, based on the time stamp of the photo of the fence, plaintiff indicated that it was possibly part of the new fence that had been put up. She also allowed that the older section of fence might have been longer than the 6 feet she had previously indicated, perhaps up to 10 feet long but certainly not as long as 20 feet. Plaintiff testified that the older sections of fence were built by prior owners of the defendant's property. The "back fence" was built by the original property owner prior to him selling the home in "the late '70s" and then a subsequent owner built the "side fence" sometime in "the late '80s." Plaintiff asserted that the new section of fence built in 2021 was not

7

straight but wavy, crossing onto the Trust's property in varying amounts due to that wave, although the wave was not visible in pictures shown to her by defendant's attorney.

¶ 16 Gary Eads, the husband of plaintiff, next testified. He testified that there was some existing fencing on the defendant's property prior to 2021, when defendant added fencing. Mr. Eads described the new fencing as "not professionally built," "hastily built, curvy" and moving "in and out." Based on his "general" knowledge of the property line between the defendant's and the Trust's property, Mr. Eads described the fence built in 2021 to be "well on the Dorman side of the fence." However, when shown photos of the fence by defendant's counsel, he could not point to the sort of weaving, bowing, or curvature he described, stating that it could not be seen from the photos' angles. Mr. Eads testified that his wife and her brother Robert Dorman were co-trustees of the Trust.

¶ 17 Plaintiff then rested and defendant moved for a directed finding in favor of defendant, arguing that no evidence established that any part of the fence rested on the Trust's property. Plaintiff objected, arguing that all witnesses thus far had testified that the fence crossed onto the Trust's property and noted that Andreas had utilized surveying equipment to come to that conclusion. The trial court denied defendant's motion.

¶ 18 Defendant testified that she lived at 2381 Keebler Road and moved into that property in May of either 2014 or 2015. She testified that when she moved into the property, there was an "old and weathered" wooden privacy fence along the "back portion" of the property, running along the driveway which was located on the side of the house. No one ever made any complaints about that fence. Initially, she rented the property but subsequently purchased it in May of 2019. She stated that she later decided to extend that fence in August 2021 because of "issues" or "conflicts" that had occurred. Prior to building the fence, she did not employ a land surveyor, but did employ one

after the fence was built, around the end of 2022 or the beginning of 2023. However, she testified that the additional fencing was built to continue from the existing fencing and also based on where known property pins were located. Defendant testified that the pins were located by some ironworkers she knew who used metal detectors to find them. A rope was then run between the two property pins between her property and the Trust's property to approximate the property line. Defendant stated that her fiancé built the fence, although she was physically present with him when he did so, and that he built the fence "feet" away from the rope run between the property pins. She testified that the fence was not curvy when built, but that it might no longer be entirely straight as it had been hit by a lawnmower in one direction and had a tree fall on it from the other.

¶ 19    Upon cross-examination, defendant agreed that Robert Dorman had suggested the property be surveyed prior to building the fence. When asked why she had not done that, defendant testified that she felt the need to put up the fence quickly to "stop things from escalating" and that she did not have the time to get a survey.

¶ 20    In a brief closing argument, plaintiff simply asked that she be awarded nominal, one dollar, damages and that the fencing that was situated on the Trust side of the property line be declared to belong to the Trust. She did not request that the fence be moved or torn down.

¶ 21    In a similarly brief closing argument, defendant asserted that plaintiff had not sufficiently proven her interest in the property at issue, as she had, at best, only a 50% interest in the Trust and its property. She also asserted, referring back to the motion for a directed finding in favor of defendant, that plaintiff had not produced sufficient evidence to show the fence was on the Trust side of the property line. She requested the petition to quiet title be denied, asserted the litigation was frivolous, and requested that she be awarded attorney fees.

¶ 22   On December 14, 2023, the trial court issued a written judgment order denying plaintiff's complaint to quiet title and finding that her action was not brought in good faith and deemed it frivolous under Illinois Supreme Court Rule 137 (Rule 137). As a sanction, the trial court ordered plaintiff to pay defendant's attorney fees and set a date for the determination of the amount to be awarded. The trial court made several factual findings supporting its judgment. First, the trial court noted that the other trustee of the Trust was Robert Dorman and that he and defendant "had a history of litigation between them and had a Mutual Injunction in place, No. 21-OP-1247, dating back to June 16, 2022[,] and was in effect when the Plaintiff filed this cause of action against the Defendant." The trial court further noted that on the same date that defendant filed her answer to plaintiff's complaint, she filed a motion for rule to show cause against Dorman in 21-OP-1247 asserting that he had violated the mutual injunction numerous times.

¶ 23   With regard to Andreas's testimony, the trial court made several findings. First, that "his friendship with Robert Dorman was so strong that he performed the requested work for free," that he acknowledged taking no photos of the locations of the property pins, made conflicting statements about the location of one of the property pins in terms of its depth in the ground, and testified that "only a licensed surveyor would be qualified to establish the corners of the property in question." It further noted that Andreas "made it clear that he was not asked to conduct a land survey" as well as the amendments he made to his testimony regarding the accuracy of the equipment he used after having Googled the device's accuracy. Ultimately, the trial court found Andreas's testimony to be "not credible and unpersuasive" and questioned his impartiality as a witness based on his friendship with Dorman. The trial court further found that Andreas had "failed to produce exhibits which established to the Court's satisfaction the location of the actual property pins as they relate to the existing placement of the fence in question."

10

¶ 24    The trial court discussed plaintiff's testimony in its order as well. It noted she had initially testified that there was no fence between the defendant and Trust properties prior to 2021, but plaintiff admitted under cross-examination that some fence existed between the properties prior to 2021, although she described it as being only about six feet in length. The trial court went on to note that "when challenged, Plaintiff eventually and begrudgingly, acknowledged that at least 3 to 4 sections of original fence existed prior to 2021." The trial court also noted that plaintiff testified that she had neither a copy of the property deed reflecting ownership of the property at issue, nor a copy of the trust documents for the Trust showing her to be a trustee. It noted that she testified she had hired a licensed surveyor to survey the property, but that surveyor had not testified and was not available to come to court on the date of trial. The trial court further took note of the fact that plaintiff testified that neither she, nor her brother Robert Dornan, had raised any objection with any government body about the construction of the fence in question. Ultimately, the trial court found her testimony unpersuasive.

¶ 25    With regard to the testimony of Mr. Eads, the trial court explicitly found his testimony not to be credible. In doing so, the trial court pointed to Mr. Eads's testimony that when presented with multiple photographs of the fence in question, Mr. Eads could not point to the curvy nature of that fence, always indicating that the angle of the photograph failed to show the alleged curvature.

¶ 26    The trial court also discussed defendant's testimony, noting that she testified that she decided to extend preexisting fencing in 2021 "to protect her family from conflict with Robert Dorman." It also noted that she testified about efforts to construct the new fence section within the property lines, having told the trial court that she had contacted experienced ironworkers, who had used metal detectors to find the property pins. A straight line was then run between the two pins

and the fence was erected "well within said line." Overall, the trial court found defendant's testimony persuasive.

¶ 27    The hearing on the issue of the amount of attorney fees was continued several times, and during that time, plaintiff's trial counsel withdrew and a different attorney entered. On December 3, 2024, plaintiff's new attorney filed a motion to rehear and reconsider the trial court's December 14, 2023, judgment order. That motion included an affidavit by surveyor Pauk, averring that, having reviewed the testimony of Andreas, he found his work to be accurate and would have testified that defendant's fence encroached upon the Trust's property if called to testify. On December 16, 2024, a year and two days after the entry of the trial court's judgment order, a hearing was held on plaintiff's motion and the amount of attorney fees to be awarded defendant as a sanction.

¶ 28    The trial court first addressed plaintiff's motion to rehear and reconsider. The trial court denied that motion, finding that plaintiff presented no newly discovered evidence in support of its motion and provided no explanation as to why surveyor Pauk was not available to testify at trial and noted that plaintiff never requested a continuance to secure Pauk's testimony. The trial court found that plaintiff had not met her burden of proof. The trial court reiterated its earlier findings that neither plaintiff nor Andreas were credible and that defendant was credible.

¶ 29    The trial court then took up the issue of sanctions under Rule 137. Defendant's counsel offered an explanation for the amount he requested in fees, $7,091, stating that he was retained in May of 2023 and had engaged in several "pretrial activities" over the course of that time, including court appearances and "numerous" contacts with his client. He asserted that the bulk of his work took place in preparation for the bench trial, with preparation time for trial totaling approximately eight hours and including the production of "schematics, pictures, diagrams, and other

12

documents," review of evidence such as text messages and emails, and engaging in legal research on the issues. Defendant's counsel then asserted that each of the two days of trial amounted to 6½ billable hours, totaling 13 hours for trial based entirely on time spent in court. Finally, there was about an hour-and-a-half spent on posttrial matters. Defendant's counsel stated that his hourly rate was $350 per hour, and he had spent 19.6 hours on the case. He also asserted that there were some filing fees adding to the total as well.

¶ 30    In response, plaintiff's counsel noted that he had filed a motion for discovery regarding the amount of attorney fees. The trial court denied that *instanter*. With that motion denied, plaintiff's counsel confirmed with defendant's counsel as to how he had arrived at the hourly numbers for the fees requested. Defendant's counsel stated that they were set forth within his fee affidavit which defendant's counsel was able to access on his phone during the hearing.

¶ 31    The trial court ordered plaintiff to pay the requested $7,091 in attorney fees as a sanction pursuant to Rule 137. As part of that order, it found that defendant's counsel quoted a "reasonable and fair" hourly rate, and that the number of hours spent on the case was reasonable based on its observation of the proceedings. The trial court did, however, ask that the fee affidavit be filed with the trial court within the next two days. Defendant's counsel filed that affidavit within the stated time limit. Attached to it was an exhibit headed "Activities Export," which gave dates for legal work performed, time spent on those activities, the full hourly billable rate for each activity, and the total billed for each activity. The exhibit totaled six pages and on the final page showed $7,091 billed for a total of 19.6 hours worked.

¶ 32    A written order memorializing the trial court's rulings on December 16, 2024, was filed on December 20, 2024. Plaintiff then filed a notice of appeal on January 15, 2025, and this appeal followed.

13

¶ 33                                    II. ANALYSIS

¶ 34    Defendant asserts that we lack jurisdiction, because plaintiff failed to file a timely notice of appeal. Plaintiff disagrees, asserting that her notice of appeal was timely, and further asserts that the trial court erred in denying her claim to quiet title, as its findings were against the manifest weight of the evidence, that sanctions were improperly imposed, and that the amount of attorney fees was improperly determined.

¶ 35    We first take up the issue of jurisdiction, as a negative finding on this matter would be dispositive. Defendant asserts that jurisdiction is lacking because judgment was final on December 14, 2023, and thus a notice of appeal was required to be filed within 30 days of that date, unless a timely posttrial motion was filed pursuant to Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017). Plaintiff counters that a notice of appeal was timely filed, as the December 14, 2023, order was not final, due to the outstanding issue of the amount of attorney fees to be imposed as a sanction under Rule 137. Plaintiff asserts that the final judgment order was entered on December 16, 2024, when the amount of attorney fees was determined as a sanction, and thus the January 15, 2025, notice of appeal was timely, as it was filed within 30 days of that date.

¶ 36    Illinois Supreme Court Rule 303 (Rule 303) determines when appeals may be taken from a civil judgment, and in relevant part states as follows:

> "The notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against the judgment is filed *** within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against that judgment or order, irrespective of whether the circuit court had entered a series of final orders that were modified pursuant to postjudgment motions. A judgment or order is not final and appealable while a Rule 137

14

claim remains pending unless the court enters a finding pursuant to Rule 304(a)." Ill. S. Ct

R. 303(a)(1) (eff. July 1, 2017).

Where an appeal is not timely filed under Rule 303, an appellate court lacks jurisdiction and the appeal must be dismissed. *Berg v. Allied Security, Inc.*, 193 Ill. 2d 186, 189 (2000); *Archers Daniel Midland Co. v. Barth*, 103 Ill. 2d 536, 538-39 (1984).

¶ 37     The express language used in Rule 303(a) supports plaintiff's position as it states that judgment is not final "while a Rule 137 claim remains pending" and the Rule 137 sanction here was not fully imposed until the December 16, 2024, order. In *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 341 (2001), the supreme court held that: "(1) absent a Rule 304(a) finding, a notice of appeal may not be filed before the trial court has disposed of all claims; (2) requests for sanctions under Rule 137 are claims within the underlying action; therefore (3) absent a Rule 304(a) finding, a notice of appeal may not be filed until the trial court has disposed of all requests for sanctions under Rule 137." See also *Dillon v. Christie Clinic, LLC*, 2024 IL App (5th) 230270-U; and *Phoenix Capital, LLC v. Tabiti*, 2016 IL App (1st) 162686.

¶ 38     Based on the foregoing well-settled authorities, the trial court's judgment order of December 14, 2023, was not final and appealable as it did not contain a Rule 304(a) finding. The amount of the sanction was imposed on December 16, 2024, causing the judgment order to be final and appealable at that point. Plaintiff's notice of appeal was timely filed on January 15, 2025. Accordingly, we have jurisdiction to address the issues raised by plaintiff on appeal.

¶ 39     Plaintiff first challenges the trial court's denial of her claim to quiet title, arguing that the trial court's findings were against the manifest weight of the evidence. Plaintiff specifically argues that the trial court's determination that Andreas was not qualified as an expert and its finding that

15

Andreas was not credible were flawed and that his testimony should have been dispositive of the matter, as defendant presented no expert testimony of her own.

¶ 40    A trial court's finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Great deference is given to the trial court and its findings because "it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Id.*

¶ 41    "The standard of review relative to the admission of expert witness testimony is whether or not the trial court abused its discretion." *Harold K. v. Ryan B.*, 313 Ill. App. 3d 692, 697 (2000). We see no reason to address whether the trial court abused its discretion in not qualifying Andreas as an expert as the trial court specifically found him not be to be a credible witness overall. "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350. The trial court took issue with several aspects of Andreas's testimony, including the fact that he performed his work for free due to being friends with plaintiff's brother Dorman, having taken no photographs of the property pins at issue, and making conflicting statements about the depth in the ground of one of the property pins. It also noted that Andreas had limited his own testimony, stating both that the work he had done was not a land survey and that only a licensed surveyor was qualified to establish the property corners. Finally, the trial court noted the most destructive aspect of Andreas's credibility: that he was forced to amend his testimony about his equipment's accuracy after using the commercial internet search engine Google to look up that information during a recess.

16

¶ 42    In addition to Andreas, the trial court did not find plaintiff or her husband credible witnesses. The trial court found that both had testified in contradiction to the photographic evidence in the case. The trial court found that plaintiff had only "begrudgingly," when confronted with photographic evidence, admitted that the original, longstanding section of fence was longer than she had originally asserted and that Mr. Eads continually asserted the fence to be curvy even when shown multiple photos belying that assertion.

¶ 43    Unlike the plaintiff, the trial court found defendant's testimony credible. Here, it was the plaintiff's burden of proof. The trial court did not find her evidence credible. Not only did the trial court find plaintiff's witnesses to lack credibility, it found that the action was not brought in good faith and was frivolous.

¶ 44    Plaintiff attempts to challenge the trial court's finding that Andreas was not credible by pointing to Pauk's affidavit attached to her motion to rehear and reconsider stating that he would have testified similarly to Andreas that the fence encroached upon the Trust property. Plaintiff initially claimed that Pauk's affidavit amounted to newly discovered evidence and therefore she should have been granted a new trial. However, in both her reply brief and at oral argument, plaintiff's counsel admitted that this evidence was not newly discovered, but instead "upon further reflection is was [*sic*] actually corroborating evidence which demonstrated the accuracy of the only expert testimony on the boundary line in this case." The trial court correctly found that plaintiff had not given any explanation as to why Pauk was not called as a witness at trial and that plaintiff never moved for a continuance to secure Pauk's testimony. If plaintiff wished for the trial court to consider Pauk's testimony, she had the ability to call him as a witness at trial. We will not revisit the trial court's credibility determinations and judgment based on plaintiff's apparent tactical error

17

by not calling Pauk as a witness. The trial court's finding that plaintiff had not proven her claim to quiet title was not against the manifest weight of the evidence.

¶ 45    Plaintiff next challenges the trial court's imposition of Rule 137 sanctions against her, claiming that she was denied due process in the imposition of those sanctions because defendant never filed a motion for Rule 137 sanctions. Further, she claims that she was denied due process because there was no hearing held before the imposition of sanctions. She also asserts that her suit was brought in good faith and thus not subject to sanctions. Defendant counters that under Rule 137, a trial court may impose sanctions on its own initiative and that the imposition of sanctions was proper given the circumstances of the case.

¶ 46    Rule 137(a) sets out in relevant part with regard to sanctions:

"If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or *upon its own initiative*, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." (Emphasis added.) Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018).

Where a court awards sanctions under Rule 137(d), it is required to issue a written explanation setting forth "with specificity the reasons and basis of any sanction so imposed." Ill. S. Ct. R. 137(d) (eff. Jan. 1, 2018). This written explanation may be part of a judgment or a separate written order. *Id.* "Whether a full hearing is required on a sanctions petition depends upon the facts of each case. If it becomes apparent from the material on file that a full hearing is unwarranted and that there is sufficient information to decide the petition, the trial court may, in its discretion, decide it on a summary basis." *Doe v. Roe*, 289 Ill. App. 3d 116, 131 (1997) (citing *Olsen v. Staniak*, 260

18

Ill. App. 3d 856 (1994)). A trial court's determination of whether to impose sanctions pursuant to Rule 137 is subject to abuse of discretion review. *Id.*

¶ 47    Here, there was no procedural error as plaintiff claims. A trial court may, as here, *sua sponte*, or, as the rule itself terms it, impose sanctions "upon its own initiative." Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018). Case law also does not require a hearing. See *Doe*, 289 Ill. App. 3d at 131. Further the trial court did set out its reasoning for imposing sanctions as part of its December 14, 2023, judgment order denying plaintiff's claim to quiet title. In that judgment order, in addition to finding plaintiff's witnesses were not credible, the trial court specifically noted the timing of this action in concert with the ongoing litigation in the mutual injunction actions between defendant and Dorman. We find no abuse of discretion in the trial court's imposition of sanctions in this case, given the facts of the case and the findings set out by the trial court.

¶ 48    Finally, plaintiff challenges the trial court's determination of attorney fees awarded as a sanction, claiming error in the failure to allow discovery and the inability to cross-examine defendant's counsel as to his attorney fees. Plaintiff cites no authority requiring discovery with regard to the amount of sanctions to be awarded. Nor do we find that the trial court erred in denying discovery in litigation it already found to be frivolous. The trial court did conduct a hearing as to the amount of the sanctions imposed. First, plaintiff's counsel never asked to cross-examine defendant's counsel under oath as to the amount of his fees. While defendant's counsel did not give sworn testimony as to the amount of his fees, he did proffer a detailed accounting of the time spent on the case and the hourly rate he charged in performing those services. That proffer was based off of an affidavit available to counsel digitally while in the courtroom and subsequently filed with the court. Plaintiff's counsel was given the opportunity to respond to the proffer of defendant's counsel but simply asked counsel after his proffer, "were you reviewing the actual

bills there on your phone?" Defendant's counsel responded that he was reviewing an affidavit prepared by his secretary, and plaintiff's counsel then stated he had nothing further on the matter, and presented no evidence challenging the amount of attorney fees.

¶ 49    An evidentiary hearing is not necessary for the determination of attorney fees, " 'if the trier of fact can determine a reasonable amount from the evidence presented, "including a detailed breakdown to fees and expenses," and the party opposing the award is not denied an opportunity to present evidence.' " (Emphasis omitted.) *In re Guardianship of H.D.*, 2021 IL App (4th) 200434-U, ¶ 23 (quoting *Williams Montgomery & John Ltd. v. Broaddus*, 2017 IL App (1st) 161063, ¶ 49, quoting *Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 37). Here, the trial court was given a detailed breakdown of fees and expenses, and plaintiff was given an opportunity to challenge that amount. The trial court did not err in its determination of the amount of sanctions awarded to defendant.

¶ 50                                    III. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the trial court's judgment.


¶ 52    Affirmed.